Opinion issued December 22, 2020



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-18-01128-CR

———————————

**LONNIE GENE KINNETT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Case No. 17CR0916**

---

## O P I N I O N

A jury convicted appellant, Lonnie Gene Kinnett, of the third-degree felony

offense of driving while intoxicated (DWI) and, after finding the allegations in two

enhancement paragraphs true, assessed his punishment at confinement for life.[1] In seven issues, appellant contends that: (1) the trial court violated his rights to compulsory process under both the United States and Texas Constitutions by denying an application for a bench warrant, denying an application for a writ of attachment, and denying a motion for continuance; (2) the Texas Constitution provides greater protection for compulsory process than the Sixth Amendment; (3) the trial court violated his rights to confrontation under both the United States and Texas Constitutions by admitting a recording of a non-emergency call to police dispatch into evidence; (4) the trial court violated his right to a fair trial under the Fifth and Fourteenth Amendments when he was deprived of his rights to confrontation and compulsory process under the United States and Texas Constitutions; (5) his *Terry* stop and detention violated the Fourth Amendment because the officer lacked reasonable suspicion; (6) the trial court erroneously refused to give a jury instruction concerning illegally obtained evidence; and (7) insufficient evidence supported the judgment of conviction.

We affirm.

---

[1]   *See* TEX. PENAL CODE ANN. §§ 49.04(a) (driving while intoxicated), 49.09(b)(2) (providing that driving while intoxicated is third-degree felony if person has two prior convictions for DWI); *see also id.* 12.42(d) (providing that if it is shown that defendant has two prior felony convictions, upon conviction of another felony offense, defendant shall be punished by twenty-five to ninety-nine years' confinement or confinement for life).

## Background

The State charged appellant with the third-degree felony offense of DWI. The indictment alleged that appellant had two prior convictions for DWI. Specifically, the indictment alleged as follows:

> And it is further presented in and to said Court that, prior to the commission of the aforesaid offense (hereafter styled the primary offense), on the 19th day of March, 1999, in cause number 700709 in the County Criminal Court No. 10 of Tarrant County, Texas, the defendant was convicted of an offense relating to the operating of a motor vehicle while intoxicated; and on the 3rd day of December, 2004, in cause number 916318 in the 371st District Court of Tarrant County, Texas, the defendant was convicted of an offense relating to the operating of a motor vehicle while intoxicated.

The indictment also included two enhancement paragraphs, alleging that appellant had been convicted of two additional felony offenses.

### A. Factual Background

At 2:32 p.m. on March 30, 2017, Michael Szanyi called the administrative number of the Santa Fe Police Department to report a reckless driver. Szanyi did not call 911. Szanyi's call to the administrative number was recorded, and the trial court admitted a recording of the call at trial. Szanyi himself did not testify.[2]

Szanyi reported that he had been driving directly behind a white Envoy or Trailblazer with paper license plates on the southbound lanes of Highway 646 in

---

[2] Defense counsel objected to admission of the call based on hearsay and violation of the Confrontation Clause.

3

Santa Fe, Texas. Szanyi stated that he thought the driver might have been drinking because the driver had been driving down the center lane of the highway, was weaving in and out of traffic, and was nearly involved in a head-on collision. Szanyi saw the driver throw what looked like a "green Heineken beer bottle" from the driver's side window. Szanyi stated that the driver made a U-Turn and pulled into the parking lot of Gator Jack's, a bar in Santa Fe. When asked by the dispatcher if the driver had gone inside Gator Jack's, Szanyi responded, "No, he hasn't got out yet. He's still sitting in his vehicle." When the dispatcher asked, Szanyi provided his name. He was not asked to provide any other identifying information.

At 2:42 p.m., Santa Fe Police Department Officer B. Klonaris received a call from dispatch about a reckless driver. Klonaris testified that the dispatcher told him that a white Envoy or Trailblazer with paper license plates was driving recklessly on Highway 646, that the driver threw what appeared to be a green beer bottle from the window, and that the driver turned into the parking lot of Gator Jack's. Gator Jack's was located approximately one quarter of a mile from the police station. When Klonaris turned into the parking lot, he saw only one white Envoy with paper license plates and a man, later identified as appellant, sitting in the driver's seat. The vehicle was the only vehicle in the parking lot. Klonaris arrived at 2:45 p.m., thirteen minutes after Szanyi's call to the Santa Fe Police Department.

When Klonaris approached the vehicle, the engine was running and appellant appeared to be asleep in the driver's seat.[3] Klonaris had to knock on the window to wake appellant up. Klonaris noticed "a smell of odor [of] alcohol on [appellant's] person" and "normal signs of intoxication," including slurred speech and disorderly clothing. Klonaris asked appellant if he had been drinking, and appellant responded that he had, at one point stating that he had started drinking two hours ago and at another point stating that he had started eight hours ago. Appellant stated that he had had his last drink two hours before the encounter with Klonaris, and he admitted driving his vehicle to Gator Jack's. Klonaris observed a six-pack of green beer bottles sitting on the passenger seat. Five bottles were present in the pack: one of the bottles was still full and the other four were empty. Klonaris agreed that this was consistent with one bottle having been thrown from the vehicle. Klonaris asked appellant if there was anyone who could come and pick him up, and when appellant responded no, Klonaris asked appellant to step out of the vehicle.

Klonaris administered the standardized field sobriety tests to appellant. Appellant displayed six clues of intoxication on the horizontal gaze nystagmus test, five clues on the walk-and-turn test, and four clues on the one-legged stand test. Klonaris concluded that appellant was intoxicated, and he placed appellant under

---

[3]    Officer Klonaris's encounter with appellant was recorded by the dash camera located in his patrol car. The trial court admitted a copy of this recording.

arrest. Appellant did not consent to give a breath or blood specimen, so Klonaris obtained a warrant for a blood draw. The blood draw was performed at Mainland Medical Center in Texas City, Texas, at 5:44 p.m., approximately three hours after Klonaris first encountered appellant.

Deputy M. Stevenson, with the Galveston County Sheriff's Office, heard the dispatch to Officer Klonaris and stopped to provide assistance. During the traffic stop, Stevenson asked appellant what his name was. Appellant responded, "[y]our daddy," and in response to another comment from Stevenson stated, "[y]our effing daddy." Stevenson testified that appellant resisted arrest by making "an assertive movement towards myself while in cuffs." Stevenson stated that appellant "[b]asically lunged towards me while in cuffs." When asked if appellant showed any other signs of intoxication, Stevenson testified that appellant was "unsteady on his feet" and had "slurred speech." Stevenson testified that, in his opinion, appellant was intoxicated.

Rachel Aubel, a forensic scientist at the Texas Department of Public Safety Crime Lab in Houston, tested appellant's blood sample for blood-alcohol content. She testified that appellant's blood sample arrived at the lab in a test tube that contained both an anticoagulant and a preservative that acted "to preserve the alcohol and loss of information from the tube." The State offered Aubel's written report concerning appellant's blood-alcohol concentration into evidence.

6

On voir dire, defense counsel asked Aubel if she had performed a retrograde extrapolation in this case. Aubel responded that she had not and that she was not asked to do so. She also testified that the paperwork submitted with appellant's blood sample stated the time of arrest and the time the blood sample was collected, but it did not state a time that appellant was driving. The following exchange among defense counsel, Aubel, the prosecutor, and the trial court occurred:

Defense counsel: Now, would you explain to the jury what a retrograde extrapolation is?

Aubel: Retrograde extrapolation is using the alcohol concentration at a known point and time and using various facts about the case estimating what the alcohol concentration could have been at a previous point and time.

The State: I object to the beyond the scope of direct examination.

The Court: Sustained. Do you have any objections to this exhibit?

Defense counsel: Yes, Your Honor, without a retrograde extrapolation.

The Court: Come on up. Give me your objections.

Defense counsel: It was my objections that without retrograde extrapolation because the time of the driving and the time that the blood is drawn is different in order for this to be admissible a report on what she had she has to process it with retrograde extrapolation that allows for the time frame that [appellant] was driving.

The trial court overruled appellant's objection and admitted Aubel's written report. Aubel testified that appellant's blood-alcohol concentration was 0.134, greater than the "legal limit" for blood-alcohol concentration, 0.08. She testified that about six to seven standard-sized drinks were necessary to reach this particular blood-alcohol concentration.

On cross-examination, Aubel testified that the number in her report reflects appellant's blood-alcohol concentration at the time of the blood draw, not at the time he was driving. She agreed that if several hours had passed between the time of driving and the time of the blood draw, the concentration would likely be different. Aubel also testified that the blood sample was taken from appellant on March 30, 2017, that the sample was received by the lab on April 18, and that she tested the sample on May 1, 2017. Defense counsel asked Aubel if, when blood begins to decompose, it could result in the formation of alcohol, and Aubel responded, "Technically if we are talking about chemical decomposition, that would result in the loss of alcohol from that blood sample." When asked if "under certain circumstances when the blood test [in the lab] is not tied so closely to when the blood was drawn that the blood sample can result in alcohol being formed that was not in the blood at that time [of the draw]," Aubel responded that she had never seen a documented case of that occurring.

On re-direct examination, Aubel testified concerning the absorption of alcohol into the bloodstream. She stated:

> When someone first begins to consume alcohol their body will very quickly begin to absorb that alcohol into the bloodstream however it can take a little bit of time after someone completes consuming alcohol in order to reach their peak alcohol concentration. Once they stop there is some time before that alcohol absorbs, within about 15 to 30 minutes of the last drink but depending if they had food in their stomach it could potentially take up to 2 hours. The process of elimination is a lot more standardized because a person's liver can only function at a certain rate. The process of elimination usually on alcohol to be eliminated at a rate of approximately 0.02 per hour.

To prove the jurisdictional requirements that appellant had two prior convictions for DWI, the State offered Exhibits 8, 9, and 10. The trial court admitted State's Exhibit 8—a certified copy of a judgment and sentence reflecting that appellant was convicted of the Class A misdemeanor offense of DWI on March 19, 1999—without objection. Appellant objected to State's Exhibit 9—a certified copy of a judgment and sentence reflecting that appellant, for an offense that occurred on December 30, 2003, was convicted of the third-degree felony offense of DWI in the 371st District Court of Tarrant County on December 3, 2004—because this document did not have appellant's fingerprints on it. Appellant also objected to State's Exhibit 10—a portion of appellant's "criminal history packet" that contained appellant's fingerprints and other identifying information; this document stated an arrest date of December 30, 2003, and indicated that the offense was for "driving while intoxi[cated]," a third-degree felony—on the basis that Exhibit 10 was not

9

"tied to" Exhibit 9. After a discussion between counsel and the trial court, defense counsel withdrew her objection to the authenticity of Exhibit 10 but "preserv[ed her] right to argue and so forth it's an insufficient link" to the conviction in Exhibit 9. The trial court admitted State's Exhibits 8, 9, and 10.

Deputy W. Kilburn, from the Galveston County Sheriff's Office, conducts fingerprint analyses, and several days before trial, he took appellant's fingerprints. Kilburn matched appellant's known fingerprint to the fingerprint on Exhibits 8 and 10. Kilburn testified that Exhibit 8 reflected that Lonnie Gene Kinnett was convicted of "DWI misdemeanor repetition class A" in the County Court Number 10 of Tarrant County. He testified Exhibit 9 reflected that Lonnie Gene Kinnett pleaded guilty to "Driving while intoxicated felony repetition" and that Exhibit 9 and Exhibit 10 both indicated that the offense occurred on December 30, 2003. On cross-examination, Kilburn agreed with defense counsel that while Exhibit 9 stated a case number, Exhibit 10 did not.

## B.     *Procedural Background*

### 1.     **Motion to Suppress**

Appellant filed a motion to suppress all tangible evidence seized as a result of his arrest, any statements he made while in custody, and any testimony concerning his actions while in detention or under arrest. Appellant argued that his vehicle was turned off and legally parked and that he was asleep in his vehicle when he was

approached by officers. He argued that the call to law enforcement was "legally insufficient" because the caller "failed to provide accurate information as to [the caller's] identity and address." He further argued that officers lacked both reasonable suspicion and probable cause to believe he had been engaged in criminal activity before the officers started speaking with him.

The trial court held a hearing on the motion to suppress on October 3, 2017. At the hearing, Michael Howell, the custodian of records and dispatch supervisor for the Santa Fe Police Department, testified that the police department received a call regarding a possible DWI on March 30, 2017. The police department received the call through its "regular administrative number" and not via 911. Howell testified that citizens use the department's administrative number to call for assistance "[a]ll the time." Calls to both 911 and the administrative number are recorded. Howell stated that the dispatch log reflected that Michael Szanyi called the administrative number.[4] Howell spoke with Szanyi and testified:

> The original call came in that [Szanyi] was behind a Trail Blazer white in color with paper tags. The caller stated the subject was all over the roadway and threw a green bottle from the vehicle and pulled from the roadway into the parking lot of a bar in our city called Gator Jacks.

Howell dispatched Officer Klonaris to the scene at 2:42 p.m. and Klonaris arrived at 2:45 p.m.

---

[4]    Howell corrected the prosecutor when she referred to this call as a 911 call.

11

Klonaris also testified at the suppression hearing. He testified that in between 2:30 and 3:00 in the afternoon, he received a call from dispatch concerning a possible drunk driver. Dispatch informed Klonaris that a white GMC Envoy with paper plates with driving erratically down Highway 646, that the driver threw a green bottle out of the window, and that the driver turned into Gator Jack's. When Klonaris arrived at Gator Jack's at 2:45 p.m., he found one vehicle in the parking lot and it matched the description given to him by dispatch.

Klonaris testified that he walked up to the driver's side window and saw a man—appellant—asleep behind the wheel. Klonaris knocked on the window and woke appellant up "[t]o see what was going on" and for "welfare concern." Klonaris saw a six-pack containing five green beer bottles sitting on the passenger seat. Klonaris asked appellant how he got to the parking lot, what he was doing there, and if he had had anything to drink. Appellant responded that he had driven to Gator Jack's and that he "was going to have a burger." Appellant admitted having had something to drink, but Klonaris testified that he did not ask how many drinks appellant had consumed. Klonaris also testified that appellant's speech was slurred, that his eyes were "glossy and glassy," and that he could smell the odor of alcohol coming from appellant.

Klonaris testified that he asked appellant to step out of the car and asked if anyone could come to pick appellant up from the parking lot. When asked why he

12

asked if appellant knew someone who could pick him up, Klonaris responded "[s]o I didn't have to arrest him for DWI." Because appellant answered that no one could pick him up, Klonaris decided to administer the field sobriety tests. Appellant exhibited six clues of intoxication on the horizontal gaze nystagmus test, six clues on the walk-and-turn test, and three clues on the one-legged-stand test. After the sobriety tests, Klonaris concluded that appellant had "lost the ability to operate a motor vehicle" and that he was intoxicated. Klonaris based this determination on "[t]he nature of the call" and "[t]he alcohol on [appellant's] breath, the glossy eyes, him stating that he had drank and him driving there and then the fact—all the clues from the standardized field sobriety test." Klonaris testified that, as he was handcuffing appellant, appellant asked why he was being arrested and Klonaris responded "for DWI." Appellant then volunteered, "I only had a six pack." The trial court admitted the recording of the video from Klonaris's dash camera, as well as the audio recording of Szanyi's call to police.

Klonaris was not asked and he did not testify that appellant's vehicle was running when he approached it. The trial court denied appellant's motion to suppress.

## 2. Subpoenas to Szanyi

On October 5, 2017, the State first applied for a subpoena to be issued to "Michael Szani" to appear for the October 16 through October 27, 2017 trial period.

13

On January 30, 2018, defense counsel applied for a subpoena to be issued to "Gregory Michael Szanyi" to appear on February 5, 2018. The application listed two potential addresses for Szanyi: his residence and his parents' house. This subpoena issued on January 30, but the return of service stated: "Not executed for reason after due search and diligent inquiry could not be found in Galveston County, Texas and returned on the 5[th] day of Feb[ruary] 2018." A handwritten notation on the return of service stated, "Subject could not be served before court date." A handwritten notation on another return of service, dated February 2, 2018, listed multiple attempts to serve Szanyi and stated, "House is vacant."

On February 5, 2018, defense counsel applied for a subpoena duces tecum for Szanyi to appear on March 26, 2018, with the cell phone that he had on the date of his call to the police department. This application listed two residential addresses in Galveston County but also listed the Harris County Criminal Court at Law Number One as an address where Szanyi could be found and specified a time of February 7, 2018, at 9:00 a.m. The return of service indicated that a private process server served Szanyi with this subpoena on February 7 at the Harris County courthouse. On March 5, 2018, the State issued a subpoena to Szanyi, among other witnesses, to appear for

the March 26 through April 6, 2018 trial setting.[5] The record reflects that Szanyi was served with this subpoena by email on March 5.

On April 2, 2018, a Monday, Szanyi appeared before the trial court and was sworn in. The trial court ordered Szanyi to return to court on Wednesday, April 4, at 9:00 a.m. Szanyi responded that he would appear. The trial court and Szanyi had the following exchange:

The Court: If for some reason he doesn't need to appear, I will just carry it day to day. You're ordered to appear whenever you get a call to come to Court. I don't think that's going to be an issue. Do you have anything preventing you from appearing?

Szanyi: Just work. That's it.

The Court: Okay. Thank you.

The case was not called for trial during this trial setting, and the record does not indicate that any court proceedings occurred on April 4, 2018.

The case was set for trial on several different dates before, on June 18, 2018, the trial court issued a docket control order setting the case for a jury trial on September 17, 2018. On July 30, 2018, the State applied for subpoenas for all of the

---

[5]     This subpoena stated: "If to be found in your County, to be and appear at 10:00 o'clock A.M., on the 26TH day of March 2018; Before the Honorable PATRICIA GRADY, 212TH JUDICIAL DISTRICT Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the State in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court."

trial witnesses, including Szanyi, for the September 17 through October 5, 2018 trial setting. There is no indication in the record that Szanyi was ever served with this subpoena.

Trial began on September 17, 2018, and a jury was selected that day. The next day, September 18, defense counsel moved for a continuance.[6] At a hearing before the trial court, counsel explained that, right after trial recessed the previous day, the prosecutor approached her and alerted her that Szanyi had a warrant for his arrest in Harris County and that he "appears to be avoiding coming [to testify at appellant's trial] because of the existing warrant for his arrest." Counsel requested that the trial court "adjourn[] trial until Mr. Szanyi can be brought and made available." When the court asked what efforts counsel planned to make to locate Szanyi, counsel requested that the court issue a bench warrant. The trial court responded that "[a] bench warrant is for someone that's in custody" and that if an active warrant existed for Szanyi's arrest, it needed to be executed. The trial court and defense counsel had the following exchange:

---

[6]    Counsel also filed a written motion for continuance and requested that the court continue the case and issue a bench warrant for Szanyi. Counsel stated that both sides had subpoenaed Szanyi and that counsel had "made [it] clear to the Court and counsel for the State, that Defendant regarded Mr. Szanyi as a material adverse witness subject to confrontation and cross-examination in this case and that Mr. Szanyi was necessary for Defendant's defense in the jury trial." Counsel argued that she was entitled to rely upon the two subpoenas previously served on Szanyi as well as the trial court's in-court admonition to him on April 2, 2018, to return, and therefore counsel was "not required to issue and serve any additional subpoena for Mr. Szanyi for trial resets."

16

| The Court: | How long would this continuance be for? You're saying until he's found arrested and brought into custody. That could be months or years. |
|---|---|
| Defense counsel: | He's a very material witness. We made it very clear we subpoenaed him personally to get him at which point he was sworn by the Court and ordered to appear and also the D.A.'s office at the same time frame subpoenaed him or put [him] on [their] witness list. They took responsibility for communicating with him relative to coming[.] I don't think it's the D.A.'s office fault. I am willing to accept he's intentionally avoiding . . . coming to this Court. |
| The Court: | Your efforts are going to be nothing? You're asking for a continuance until he's arrested. I just want to understand what you're asking for [counsel]. |
| Defense counsel: | Legally I am entitled to rely on the prior stuff. I have no problem. I am not in control of law enforcement of trying to locate his whereabouts such that law enforcement could serve him. |
| The Court: | You have tried to locate him? |
| Defense counsel: | We did. We had him served at a criminal proceeding in Harris County on February 7th. It's the same criminal proceeding which was reduced to a judgment [of] conviction on May 18th of this year. |

The State informed the trial court that it had been unable to subpoena Szanyi for the trial date, stating that "he started avoiding us." The prosecutor then stated that Szanyi was "not material to the State's case," that he did not need Szanyi as a witness, and that defense counsel could not articulate why Szanyi was a material witness, such that a continuance would be an appropriate remedy. The trial court stated: "Even if I [grant the continuance], this guy could be on the lam for years and

17

I can't keep your client in custody for years while we are trying to locate this witness. Why is this a material witness?" Defense counsel responded that Szanyi was the person who called the administrative number of the Santa Fe Police Department to report appellant's driving and that Szanyi's call "is hearsay unless he's here to sponsor it." Defense counsel also stated that Szanyi's presence at trial was necessary to determine his credibility, prejudice, and bias towards law enforcement and the State. Counsel further stated, "The stop [of appellant] is going to be invalid without a sponsoring witness [as to] how any information got to law enforcement."

The court agreed to continue the case until the following Monday, September 24, 2018. The court stated, "I want affirmative efforts. I am not going to continue this case for years until a witness can be found . . . " and "[w]e are not going to continue this case on the lam with an active warrant." The court requested that the parties provide paperwork to issue a writ of attachment, if necessary.

On September 19, defense counsel filed a written application for a writ of attachment for Szanyi pursuant to Texas Code of Criminal Procedure article 24.12. This application briefly set out the attempts to serve Szanyi and attached the two subpoenas that were served upon him as well as the reporter's record from the April 2 hearing. The application stated, "Gregory Michael Szanyi, Jr. is a material witness in this cause," but it provided no further detail. Two days later, on September 21, a Friday, the trial court held a hearing on this application. Defense counsel stated that

18

she had been unable to locate Szanyi, and she offered several exhibits demonstrating that attempts had been made to serve Szanyi in unrelated legal proceedings in the months in between Szanyi's appearance in court in April 2018 and appellant's trial in September 2018, but these attempts had not been successful. The trial court asked whether anyone had subpoenaed Szanyi to appear for the September trial setting, and defense counsel responded that no one had and that she was "relying upon the Court swearing him in as a witness April the 2nd." The trial court stated, "That was for that particular trial period and the case was continued beyond that setting and now it's come back on the docket and we have already selected a jury for the September setting."

During this hearing, defense counsel and the trial court had the following exchange:

Counsel:    [A]t this time, Your Honor, we are asking for the additional assistance of a writ of attachment from this Court relative to trying to locate [Szanyi] because obviously this is somebody that, that if we were to serve him with a subpoena, he's most likely not to show up and respon[d] to it.

The Court:  But he can't be found to even be served.

Counsel:    I don't think he can be found at all. . . . We don't think that serving him with a subpoena would produce him in court. We think we—we have been making every effort and we are going to redouble our efforts but the writ of attachment would hopefully help us if we can find him to be able to make sure he's here and not just say well, Judge, we subpoenaed him. Guess what he didn't come to court. He doesn't plan to do that.

19

The Court:    All right.

Counsel:    So, you know, that's—and you know we don't control the law enforcement and we are very concerned about the State's position that they have decided it's not—it's not important to them that Mr. Szanyi be here and I think that really interferes with the defendant's right to compulsory process because they are the people that should be looking to obtain him. We don't have anything right now. There is warrants for him, yes. But we don't have anything out of this case to assist us in taking possession of him.

The prosecutor responded that he wanted Szanyi to testify because he was the caller who witnessed appellant's driving, but he did not believe Szanyi was a necessary witness for either party. The prosecutor also stated that he did not believe Szanyi was "served a sufficient subpoena to come to this court date" and therefore he did not believe a writ of attachment could issue. Defense counsel then elaborated on why she believed Szanyi was a material witness, stating that if the jury heard Szanyi's call to the police, they would assume that Szanyi's observations were accurate and the defense needed to subject him to cross-examination. Counsel argued that, on the call to the police, Szanyi "attempted to obscure his identity" by not giving his full name, and he did not identify his address or phone number. The trial court denied appellant's application for a writ of attachment.

On Monday, September 24, defense counsel filed a renewed motion for continuance and application for a writ of attachment. Counsel attached to this motion

20

a copy of the subpoena that the State issued for Szanyi on July 30, 2018.[7] Counsel stated that the prosecutor "is believed to have served this subpoena to Mr. Szanyi by email to his personal email as was done in the past," and counsel also noted that the prosecutor had Szanyi's phone number "and a subpoena in a criminal [proceeding] may be served by a phone call to the subpoenaed individual." Counsel argued that appellant was entitled to rely upon this subpoena issued by the State. The trial court denied this renewed motion.

### 3. Jury Charge

At the charge conference, appellant requested that the trial court give a jury instruction pursuant to Code of Criminal Procedure article 38.23 concerning illegally obtained evidence. Specifically, defense counsel argued that a fact issue existed regarding whether appellant's vehicle was running at the time Officer Klonaris approached his vehicle. Counsel argued that the video recording from Klonaris's dash camera raised the issue of whether the vehicle was running—contradicting Klonaris's testimony that the vehicle was running—and that this issue was material because no witness who testified actually saw appellant operate the vehicle. The trial court denied this request and did not include an article 38.23 instruction in the jury charge.

---

[7] As stated above, the record does not indicate that this subpoena was ever served on Szanyi. No return of service appears in the record.

21

The jury ultimately found appellant guilty of the third-degree felony offense of DWI. During the punishment phase, appellant pleaded not true to the allegations in two enhancement paragraphs. The jury found the allegations in the enhancement paragraphs to be true and assessed appellant's punishment at confinement for life. Appellant filed a motion for new trial, which was overruled by operation of law. This appeal followed.

## Sufficiency of the Evidence

In his seventh issue, appellant contends that the State failed to present sufficient evidence to support his conviction. Specifically, he contends that the State did not present sufficient evidence of one of the two required prior DWI convictions needed to confer felony jurisdiction on the trial court and that the State did not prove that he was operating a vehicle. Appellant also contends that the State failed to prove that the blood-alcohol test results were valid for the time appellant was driving.[8]

### A.    *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt.

---

[8]    Appellant briefly contends in his seventh issue that the State failed to prove that Szanyi's call was a business record. As this is an admissibility of evidence argument and not a sufficiency of evidence argument, we address this argument in the section of the opinion discussing whether admission of Szanyi's call violated appellant's rights under the Confrontation Clause.

*See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Bohannan v. State*, 546 S.W.3d 166, 178 (Tex. Crim. App. 2017). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008); *see Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011) (stating that role of fact finder is "as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence"). The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *Rivera v. State*, 507 S.W.3d 844, 853 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd); *see Bohannan*, 546 S.W.3d at 178 (stating that fact finder has duty to resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Bohannan*, 546 S.W.3d at 178; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We resolve any inconsistences in the evidence in favor of the verdict. *Bohannan*, 546 S.W.3d at 178; *see also Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination."). A criminal conviction may be based on circumstantial evidence. *Merritt v. State*, 368 S.W.3d 516, 525

23

(Tex. Crim. App. 2012). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

## B.  *Analysis*

### 1.  Jurisdictional enhancement

Appellant first argues that the State failed to present sufficient evidence of one of the jurisdictional enhancements used to elevate the DWI offense from a misdemeanor to a felony. Specifically, he argues that the State failed to prove that he was the person convicted of DWI on December 3, 2004, in Tarrant County, pointing out that the judgment of conviction for this offense did not have a fingerprint on it.

Typically, DWI is a Class B misdemeanor. *See* TEX. PENAL CODE ANN. § 49.04(a)–(b). However, DWI is a third-degree felony if it is shown that the person has previously been twice convicted of any offense relating to operating a motor vehicle while intoxicated. *Id.* § 49.09(b)(2); *Ex parte Rodgers*, 598 S.W.3d 262, 264 (Tex. Crim. App. 2020). "A conviction used under section 49.09(b) raises the DWI

to a felony grade and is an element of the felony DWI." *Carroll v. State*, 51 S.W.3d 797, 799 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd); *see Ross v. State*, 192 S.W.3d 819, 821 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("Proof of two prior convictions is an element of the felony offense of driving while intoxicated."). Elevating a DWI offense from a misdemeanor to a felony by using prior DWI convictions "creates a new offense and vests the district court with jurisdiction." *Carroll*, 51 S.W.3d at 799. To establish that the defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007).

There is no specific document or mode of proof required to prove that a prior conviction exists and the defendant is linked to that conviction. *Id.* The Court of Criminal Appeals has stated:

> There is no "best evidence" rule in Texas that requires that the fact of a prior conviction be proven with any document, much less any specific document. While evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, the State may prove both of these elements in a number of different ways, including (1) the defendant's admission or stipulation, (2) testimony by a person who was present when the person was convicted of the specified crime and can identify the defendant as that person, or (3) documentary proof (such as a judgment) that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted.

*Id.* at 921–22. "Any type of evidence, documentary or testimonial, might suffice" to prove a prior conviction. *Id.* at 922. The fact finder looks at the totality of evidence admitted concerning the prior conviction to determine (1) whether there was a prior conviction, and (2) whether the defendant was the person convicted. *Id.* at 923; *see Henry v. State*, 509 S.W.3d 915, 919 (Tex. Crim. App. 2016) (stating that fact finder "must look at the totality of the evidence adduced" and "must consider the evidence as a whole, as each piece of evidence may provide little meaning if considered in isolation").

Here, the indictment alleged that appellant had two prior DWI convictions that served as jurisdictional enhancements: (1) a conviction on March 19, 1999, in the County Criminal Court Number 10 of Tarrant County, cause number 700709; and (2) a conviction on December 3, 2004, in the 371st District Court of Tarrant County, cause number 916318. As evidence relevant to these convictions, the trial court admitted State's Exhibit 7 (a fingerprint card with appellant's known fingerprints taken at trial after a jury was selected), State's Exhibit 8 (a certified copy of the judgment and sentence relating to the first jurisdictional enhancement, which contained appellant's fingerprint), State's Exhibit 9 (a certified copy of the judgment and sentence relating to the second jurisdictional enhancement, which did not contain appellant's fingerprint), and State's Exhibit 10 (a portion of appellant's "pen packet" that described an arrest that occurred on December 30, 2003, and contained

his fingerprints). Deputy Kilburn matched appellant's known fingerprints to State's Exhibits 8 and 10.

State's Exhibit 9—the judgment and sentence for the second jurisdictional enhancement—is captioned "The State of Texas vs. Lonnie Gene Kinnett," reflects a cause number of "0916318D," states that the court is the 371st District Court of Tarrant County, and states that the date of judgment is December 3, 2004. This exhibit also states that the "Offense Date" is December 30, 2003, and that the offense is "Driving While Intoxicated and Felony Repetition," a third-degree felony. State's Exhibit 10—an arrest record from appellant's "pen packet"—states a "Date of Arrest" of December 30, 2003, states a name of "Lonnie G. Kinnett," states that the offense is "Driving While Intoxi[cated]," and states that the offense is a third-degree felony. State's Exhibits 9 and 10 contain matching information: appellant's name, the offense, the degree of offense, and the date of arrest. Exhibit 10 contains a full set of fingerprints, which Deputy Kilburn matched to appellant's known fingerprints.

Viewing the totality of the evidence admitted in the light most favorable to the verdict, as we must when conducting a sufficiency review, we conclude that a reasonable jury could have found beyond a reasonable doubt that (1) a prior conviction—namely, a conviction for DWI on December 3, 2004, in the 371st District Court of Tarrant County—exists, and (2) appellant is linked to that conviction. *See Flowers*, 220 S.W.3d at 921–23; *see also Bohannon*, 546 S.W.3d at

27

178 (setting out sufficiency of evidence standard of review); *Henry*, 509 S.W.3d at 919 (stating that fact finder "must look at the totality of the evidence adduced" and "must consider the evidence as a whole, as each piece of evidence may provide little meaning if considered in isolation").

### 2. Whether appellant was operating a vehicle

Appellant next argues that the State failed to prove he was operating a vehicle. Specifically, he argues that Szanyi's call to police identified the driver of the vehicle as "him" but did not give a physical description or state whether the driver was alone, Officer Klonaris did not observe him driving, and the dash-cam video supported a conclusion that the vehicle was not running at the time of the stop.

To establish that appellant committed the offense of DWI, the State was required to prove that appellant was "intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE ANN. § 49.04(a). For the evidence to be sufficient to support a conviction for DWI, a "temporal link" must exist between the defendant's intoxication and his driving. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). This temporal link may be established by circumstantial evidence. *Id.* (noting that circumstantial evidence is as probative as direct evidence in establishing guilt).

The Penal Code does not define "operate" or "operating." To assess the sufficiency of the evidence to support this element of the offense of DWI, the Court

of Criminal Appeals has defined "operate" as "taking 'action to affect the function of [a] vehicle in a manner that would enable the vehicle's use.'" *Kirsch v. State*, 357 S.W.3d 645, 648 (Tex. Crim. App. 2012) (quoting *Denton v. State*, 911 S.W.2d 388, 390 (Tex. Crim. App. 1995)). Courts consider the totality of the circumstances in determining whether sufficient evidence supports a conclusion that the defendant operated the vehicle. *Denton*, 911 S.W.2d at 390; *Dansby v. State*, 530 S.W.3d 213, 228 (Tex. App.—Tyler 2017, pet. ref'd) (concluding that evidence was sufficient to support conviction when officer found unoccupied truck running in restaurant parking lot and defendant, who was inside restaurant, admitted he had driven vehicle from nearby bar to his house before driving to restaurant).

Courts interpret "operating" a motor vehicle "very broadly." *Priego v. State*, 457 S.W.3d 565, 569 (Tex. App.—Texarkana 2015, pet. ref'd) (quoting *Smith v. State*, 401 S.W.3d 915, 919 (Tex. App.—Texarkana 2013, pet. ref'd)). "[W]hile driving does involve operation, operation does not necessarily involve driving." *Denton*, 911 S.W.2d at 389; *Priego*, 457 S.W.3d at 569 (stating that "any action that is more than mere preparation toward operating the vehicle" falls under definition of "operating" set out in *Denton* and that "[t]he action taken to affect the functioning of the vehicle 'need not succeed in causing the vehicle to function for the person to be operating it'") (quoting *Smith*, 401 S.W.3d at 919, and *Strong v. State*, 87 S.W.3d 206, 215 (Tex. App.—Dallas 2002, pet. ref'd), *abrogated on other grounds by*

29

*Pfeiffer v. State*, 363 S.W.3d 594 (Tex. Crim. App. 2012)). Courts have therefore upheld DWI convictions in situations in which the defendant was not actually driving the vehicle. *Priego*, 457 S.W.3d at 569.

Appellant contends that the State did not present sufficient evidence that he was operating a vehicle because (1) Szanyi's call to police identified the driver of the vehicle as "him" but did not provide a physical description and did not state whether the driver was alone in the vehicle; (2) Officer Klonaris did not observe appellant operating a vehicle; and (3) the video from Klonaris's dash-cam supported the conclusion that the vehicle was not running at the time of the stop. We disagree that the evidence is insufficient to support the conclusion that appellant was operating a motor vehicle.

In his call to police, Szanyi reported that a white Envoy or Trailblazer with paper license plates was driving in a reckless manner on Highway 646. He observed the driver throw a green bottle out of the window and pull into the parking lot of Gator Jack's, a bar located on Highway 646. Szanyi made his call at 2:32 p.m. Ten minutes later, at 2:42 p.m., Klonaris received a dispatch concerning Szanyi's call. Klonaris arrived at Gator Jack's three minutes after he received the dispatch, at 2:45 p.m. When Klonaris pulled into the parking lot, he saw one white Envoy with paper license plates in the parking lot. Klonaris testified that, when he approached the vehicle, the vehicle was running and the only person inside the vehicle—appellant—

30

appeared to be asleep. Appellant admitted that he had been drinking earlier in the day, and he admitted to driving his vehicle to Gator Jack's. Klonaris observed, in the passenger seat of the vehicle, a six-pack of green beer bottles with only five bottles remaining in the pack: one was still full and the other four were empty.

Although Klonaris did not witness appellant driving his vehicle, a reasonable jury could conclude that appellant had been operating the vehicle in a public place due to (1) the short time frame between Szanyi's call to the Santa Fe Police Department and Klonaris's arrival at Gator Jack's, where he saw appellant in the only white Envoy with paper license plates in the parking lot, (2) Klonaris's testimony that the vehicle was running and appellant was the only person in the vehicle, (3) Klonaris's testimony that he observed four empty beer bottles in the car and one bottle was missing from the six-pack, and (4) appellant's admission that he had been drinking and that he drove to Gator Jack's. *See Priego*, 457 S.W.3d at 570–71 (holding evidence was sufficient to support conclusion that defendant operated vehicle when vehicle was found in public parking lot, no evidence in record suggested anyone other than defendant operated vehicle, defendant was found unconscious in vehicle, vehicle was running, defendant smelled strongly of alcohol and was still wearing her seatbelt, and partially consumed bottle of whiskey was found on floorboard); *Guess v. State*, 419 S.W.3d 361, 365–66 (Tex. App.—Tyler 2010, pet. ref'd) (holding same when vehicle was found stuck in embankment,

31

defendant was only person in vehicle, hood of vehicle was warm to touch, fresh mud was found on vehicle, defendant admitted he had tried to drive out of embankment, and no open containers of alcohol were found in vehicle "so he did not drink alcohol after becoming stuck in the embankment").

We conclude that the State presented sufficient evidence that appellant operated his vehicle.

### 3. Validity of blood-alcohol test results

Appellant further argues that the State failed to prove that the blood alcohol test result was valid for the time period in which appellant was driving because the blood draw occurred approximately three hours after appellant was arrested, there was no testimony concerning the exact time appellant was driving, and the State failed to offer evidence of a retrograde extrapolation concerning the blood-alcohol test results.[9]

---

[9] Appellant also argues that the blood "was placed in an expired test kit," but appellant cites no evidence in the record of an "expired test kit." To the extent appellant argues that the test kit was expired—and the blood-alcohol test results were therefore invalid—because appellant's blood was drawn on March 30, 2017, but it was not received by the lab until April 18, 2017, and it was not tested by Aubel until May 1, 2017, one month after the blood draw occurred, we note that when Aubel was asked by defense counsel if "when blood begins to decompose then that can result in the formation of alcohol" in the sample, Aubel testified that a chemical decomposition "would result in the loss of alcohol from that blood sample." When asked "when the blood test is not tied so closely to when the blood was drawn that the blood sample can result in alcohol being formed that was not in the blood [at the time of the draw]," Aubel responded, "I have never seen any documented cases of that happening accidental in a living person."

As stated above, to support a conviction for DWI, a "temporal link" must exist between the defendant's intoxication and his driving. *Kuciemba*, 310 S.W.3d at 462. The Penal Code defines "intoxicated" in two ways: (1) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, among other things, into the body; or (2) having an alcohol concentration of 0.08 or more. TEX. PENAL CODE ANN. § 49.01(2); *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010). "The first definition is the 'impairment' theory, while the second is the 'per se' theory," and these theories are not mutually exclusive. *Kirsch*, 306 S.W.3d at 743. In *Kirsch*, the Court of Criminal Appeals stated that "BAC-test results, even absent expert retrograde extrapolation testimony, are often highly probative to prove both per se and impairment intoxication." *Id.* at 745. However, a blood-alcohol test result, without more, is not sufficient to prove intoxication at the time of driving. *Id.* "There must be other evidence in the record that would support an inference that the defendant was intoxicated at the time of driving as well as at the time of taking the test." *Id.* "Other evidence" indicating that a defendant was intoxicated at the time of driving—as well as at the time of the blood draw—includes erratic driving, post-driving behavior such as stumbling, swaying, slurring or mumbling words, inability to perform field sobriety tests or follow directions, bloodshot eyes, any admissions by the defendant concerning when and how much he had been drinking, "in short, any and all of the usual indicia of intoxication." *Id.*

Here, the jury charge instructed the jury on both theories of intoxication—the impairment theory and the per se theory. On appeal, appellant argues that the blood-alcohol test results constituted no evidence of appellant's blood-alcohol level at the time that he was driving his vehicle because the blood draw occurred approximately three hours after his arrest and the State did not offer expert testimony concerning retrograde extrapolation. As the Court of Criminal Appeals held in *Kirsch*, however, blood-alcohol test results "are often highly probative to prove both per se and impairment intoxication" even when the State does not present expert testimony on retrograde extrapolation. *See id.* The blood-alcohol test result by itself is not sufficient to prove intoxication at the time of driving, but it may be considered along with other indicia of intoxication. *See id.*

In addition to appellant's blood-alcohol test result, which reflected that appellant's blood-alcohol level at the time of the blood draw—taken three hours after appellant's arrest—was 0.134,[10] the State presented other indicia of intoxication. Specifically, the State presented Szanyi's call to police, in which Szanyi described

---

[10] Aubel testified concerning the rate of absorption of alcohol into the bloodstream and stated that "it can take a little bit of time after someone completes consuming alcohol in order to reach their peak alcohol concentration." She stated, "Once they stop [drinking] there is some time before that alcohol absorbs, within about 15 to 30 minutes of the last drink but depending if they had food in their stomach it could potentially take up to 2 hours. . . . The process of elimination usually on alcohol to be eliminated at a rate of approximately 0.02 per hour." There was no testimony that appellant continued drinking during the time period after Klonaris encountered him at 2:45 p.m. and before the blood draw at 5:40 p.m.

appellant's vehicle, reported that the driver was driving recklessly, and reported that the driver threw a green bottle out of a window before pulling into the parking lot of a bar. Upon encountering appellant asleep in his vehicle in the parking lot at Gator Jack's, Klonaris testified that he could smell the odor of alcohol on appellant's person, that appellant was slurring his words, and that appellant's clothing was disorderly. Appellant admitted to drinking that day—although he gave inconsistent responses to Klonaris concerning when he started drinking—and he admitted driving to Gator Jack's. Klonaris observed several empty green beer bottles in appellant's vehicle, and the six-pack container of bottles was missing one, consistent with appellant's having thrown a bottle from his car. Appellant displayed multiple clues of intoxication on each of the three field sobriety tests. Officer Stevenson testified that appellant was unsteady on his feet and engaged in assertive behaviors. Both officers testified that they believed appellant was intoxicated. *See Zill v. State*, 355 S.W.3d 778, 785–86 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (listing factors constituting evidence of intoxication—including "slurred speech, bloodshot or glassy eyes, unsteady balance, a 'staggering gait,' and the odor of alcohol on the person or on her breath"—and stating that "[t]he testimony of a police officer regarding the defendant's behavior and the officer's opinion that the defendant is intoxicated provides sufficient support to uphold a jury verdict").

35

The blood-alcohol test result, even without expert testimony on retrograde extrapolation, was probative of intoxication. The State also presented other evidence indicating that appellant was intoxicated at the time he was driving. We conclude that, even without retrograde extrapolation testimony to accompany the blood-alcohol test results, when viewing the evidence in the light most favorable to the verdict, a reasonable jury could conclude that appellant was intoxicated at the time that he had operated his vehicle. *See Kennemur v. State*, 280 S.W.3d 305, 314–15 (Tex. App.—Amarillo 2008, pet. ref'd) (considering blood-alcohol test result among other factors indicating intoxication even though blood draw occurred seven hours after defendant was in car accident and stating that test result "tend[ed] to make it more probable that he was intoxicated at the time of the collision because [it] provided evidence that he had introduced alcohol into the body prior to the accident" and no evidence in record indicated that defendant consumed alcohol after leaving bar or following car accident).

We overrule these portions of appellant's seventh issue.

### Compulsory Process

In his first issue, appellant contends that the trial court violated his right to compulsory process under the Sixth Amendment and Article I, section 10 of the Texas Constitution when it denied his application for a bench warrant for Szanyi, denied his application for a writ of attachment, and denied his motion for

36

continuance. In his second issue, appellant contends that the Texas Constitution provides greater protection for compulsory process rights than the Sixth Amendment.

## A. *Standard of Review and Governing Law*

Both the United States and Texas Constitutions provide that a criminal defendant has the right to compulsory process for obtaining witnesses in his favor. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. At a minimum, the Compulsory Process Clause of the United States Constitution guarantees "that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987); *Macias v. State*, 539 S.W.3d 410, 421 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.").

The Court of Criminal Appeals has stated:

The Sixth Amendment does not guarantee, however, the right to secure the attendance and testimony of any and all witnesses; rather, *it guarantees only compulsory process for obtaining witnesses whose testimony would be both material and favorable to the defense*. To

37

exercise the federal constitutional compulsory process right, the *defendant must make a plausible showing to the trial court*, by sworn evidence or agreed facts, that *the witness' testimony would be both material and favorable to the defense*. A defendant who has not had an opportunity to interview a witness may make the necessary showing by establishing the matters to which the witness might testify and the relevance and importance of those matters to the success of the defense. Were the burden of showing materiality and favorableness not placed on the defendant, "frivolous and annoying requests [c]ould make the trial endless and unduly burdensome on the Court and all officers thereof."

*Coleman v. State*, 966 S.W.2d 525, 527–28 (Tex. Crim. App. 1998) (quoting *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983)) (emphasis added); *Macias*, 539 S.W.3d at 421–22; *see In re State*, 599 S.W.3d 577, 599 (Tex. App.—El Paso 2020, orig. proceeding) ("The right to compulsory process gives defendants 'the right to secure *the attendance* of witnesses whose testimony would be both material and favorable to the defense.'") (quoting *Emenhiser v. State*, 196 S.W.3d 915, 921 (Tex. App.—Fort Worth 2006, pet. ref'd)).

Evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Freeman v. State*, 413 S.W.3d 198, 205 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (quoting *Harris v. Thompson*, 698 F.3d 609, 627 (7th Cir. 2012)). As a result, a defendant "does not have a right to compulsory process for testimony that is 'incompetent, privileged or otherwise inadmissible under standard rules of evidence.'" *Id.* (quoting *United States v. Walker*, 410 F.3d 754, 758 (5th Cir. 2005)). "Counsel's mere belief that a witness

would support the defense's case is insufficient to establish materiality." *Emenhiser*, 196 S.W.3d at 921. We review complaints concerning limitations on the right to compulsory process for an abuse of discretion. *Freeman*, 413 S.W.3d at 205.

Code of Criminal Procedure chapter 24 governs subpoenas and attachment in criminal cases. Article 24.03(a) provides:

> Before the clerk or his deputy shall be required or permitted to issue a subpoena in any felony case pending in any district or criminal district court of this State of which he is clerk or deputy, the defendant or his attorney or the State's attorney shall make an application in writing or by electronic means to such clerk for each witness desired. . . . [A]s far as is practical such clerk shall include in one subpoena the names of all witnesses for the State and for defendant, and such process shall show that the witnesses are summoned for the State or for the defendant. When a witness has been served with a subpoena, attached or placed under bail at the instance of either party in a particular case, such execution of process shall inure to the benefit of the opposite party in such case in the event such opposite party desires to use such witness on the trial of the case, provided that when a witness has once been served with a subpoena, no further subpoena shall be issued for said witness.

TEX. CODE CRIM. PROC. ANN. art. 24.03(a). Article 24.04 sets out methods for service and return of subpoenas, and allows for service of a subpoena by, among other means, "electronically transmitting a copy of the subpoena, acknowledgement of receipt requested, to the last known electronic address of the witness." *Id.* art. 24.04(a)(3). "The officer having the subpoena shall make due return thereof, showing . . . the acknowledgment of receipt" if the subpoena is served electronically. *Id.* art. 24.04(b). If the subpoena is not served, the officer "shall show

39

in his return the cause of his failure to serve it." *Id.* If receipt of an electronically served subpoena "is not acknowledged within a reasonable time," the officer "shall use due diligence to locate and serve the witness," or state the diligence he has used to find the witness, if the witness cannot be found. *Id.* A subpoena that is served electronically "must be accompanied by notice that an acknowledgment of receipt of the subpoena must be made in a manner enabling verification of the person acknowledging receipt." *Id.* art. 24.04(c). A witness refuses to obey a subpoena if "he is not in attendance on the court on the day set apart for taking up the criminal docket or on any day subsequent thereto and before the final disposition or continuance of the particular case in which he is a witness." *Id.* art. 24.06(1).

Article 24.11 provides that an "attachment" is "a writ issued by a clerk of a court under seal . . . in any criminal action or proceeding authorized by law, commanding some peace officer to take the body of the witness and bring him before the court . . . on a day named, or forthwith, to testify in behalf of the State or of the defendant, as the case may be." *Id.* art. 24.11. Article 24.12 provides:

> When a witness who resides in the county of the prosecution has been duly served with a subpoena to appear and testify in any criminal action or proceeding fails to so appear, the attorney representing the state or the defendant may request that the court issue an attachment for the witness. The request must be filed with the clerk of the court and must include an affidavit of the attorney representing the state or the defendant, as applicable, stating that the affiant has good reason to believe, and does believe, that the witness is a material witness.

40

*Id.* art. 24.12. A writ of attachment under article 24.12 "may only be issued by the judge of the court in which the witness is to testify if the judge determines, after a hearing, that the issuance of the attachment is in the best interest of justice." *Id.* art. 24.111(b).

## B. *Writ of Attachment*

When a subpoena issues, it "inure[s] to the benefit of the opposite party in such case in the event such opposite party desires to use such witness on the trial of the case." *Id.* art. 24.03(a); *Gentry v. State*, 770 S.W.2d 780, 785 (Tex. Crim. App. 1988). A writ of attachment is the proper remedy when, after being subpoenaed, a witness fails to appear as directed. *Gentry*, 770 S.W.2d at 785; *see Campbell v. State*, 551 S.W.3d 371, 377 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (stating that Code of Criminal Procedure "requires a defendant to properly serve a subpoena on a witness before the defendant has a right to compulsory process to compel the witness's attendance at trial if the witness has failed to appear").

In *Gentry*, the Court of Criminal Appeals noted that Code of Criminal Procedure article 24.01 authorizes a party to "summon one or more persons to appear at a specified term of the court, or on a specified day, to testify." *See* 770 S.W.2d at 785 (quoting TEX. CODE CRIM. PROC. ANN. art. 24.01). Article 24.06 provides that a person refuses to obey a subpoena in one of several ways, including by failing to be in attendance in the court "on the day set apart for taking up the criminal docket or

41

on any day subsequent thereto and before the final disposition or continuance of the particular case in which he is a witness." *Id.* (quoting TEX. CODE CRIM. PROC. ANN. art. 24.06). The court stated that, "[i]n other words . . . one disobeys a subpoena if he fails to appear on the date noted in the subpoena or fails to be present any day subsequent thereto." *Id.* The Court of Criminal Appeals then stated:

> It would be illogical and unreasonable to require a subpoenaed witness to appear on a certain date, at a certain time and remain there *ad infinitum*. Accordingly, Article 24.06(1), supra, demands the presence of a subpoenaed witness only so long as the case is not finally disposed of or the case is continued. In the event the case is concluded or continued the witness is no longer subject to the subpoena.

*Id.* at 785–86.

In *Gentry*, the State subpoenaed a witness to appear on January 16, 1984. *See id.* at 784–85. The case was continued beyond that trial setting to February 1, 1984, when jury selection began. *Id.* at 785. The State did not call the witness to testify. *Id.* Instead, the defendant called the witness to testify on March 1, 1984, but the witness did not appear. *Id.* The defendant made an oral motion for continuance and requested that the trial court issue a writ of attachment for the missing witness, but the trial court denied both requests. *Id.* The Court of Criminal Appeals concluded that because the case was continued from its original January 16, 1984 trial setting, the witness "was no longer subject to the subpoena issued by the state" and therefore the witness "was not in disobedience of a subpoena when he was not present to

testify on March 1, 1984." *Id.* at 786. The court held that the trial court did not err in denying the defendant's request for a writ of attachment. *Id.* at 788.

This case is analogous to *Gentry*. Here, both the State (via email) and the defense (via private process server) served Szanyi with a subpoena ordering him to appear on March 26, 2018, for the March 26 through April 6 trial setting. Szanyi appeared before the trial court on April 2, 2018, and was sworn in. The trial court ordered Szanyi "to come back to this Court on Wednesday [April 4] at 9:00 a.m. and we will go from there." Szanyi agreed. There is no indication in the record that anything occurred in the trial court on April 4, 2018. The case did not go to trial during this trial setting. The case was continued and reset several times before it was finally called for trial on September 17, 2018. The record reflects that, on July 30, 2018, the State applied for the issuance of subpoenas for all trial witnesses, including Szanyi, for the September 17, 2018, through October 5, 2018 trial setting. The record does not reflect that Szanyi was served with this subpoena, and no return of service for this subpoena appears in the record. Szanyi did not appear for trial on September 17, 2018. Evidence submitted at multiple hearings indicated that Szanyi—who, in the interim time period, had had a warrant issued for his arrest—was avoiding contact with the State and the defense and was not able to be found.

Although Szanyi had been served with two subpoenas for a prior trial setting on March 26, 2018, the case had been continued beyond that trial setting. The record

does not indicate that Szanyi was ever served with a subpoena for the September 17, 2018 trial setting. We conclude, as in *Gentry*, that because the case was continued from the March 26, 2018 trial setting, Szanyi "was no longer subject to the subpoena issued" for that trial setting, and he was not severed with a subpoena for a later setting, so that he was "not in disobedience of a subpoena when he was not present to testify" on September 17, 2018. *See id.* at 786.

Furthermore, even if Szanyi was still subject to a subpoena to appear for the September 17, 2018 trial setting, we would still hold that the trial court did not err by refusing to issue the writ of attachment because appellant did not demonstrate that Szanyi's testimony would have been material.

The Court of Criminal Appeals has established a three-step procedure for preserving error when a subpoenaed witness does not appear for trial. *Sturgeon v. State*, 106 S.W.3d 81, 85 (Tex. Crim. App. 2003) (citing *Erwin v. State*, 729 S.W.2d 709, 714 (Tex. Crim. App. 1987), *superseded by statute on other grounds as stated in Burks v. State*, 876 S.W.2d 877 (Tex. Crim. App. 1994)). First, the party must request a writ of attachment, which the trial court must deny. *Id.* Second, the party must show what the witness would have testified to. *Id.* Third, the testimony that the witness would have given must be relevant and material. *Id.* If all three requirements are met, reversible error exists unless the error made no contribution to the conviction or the punishment. *Id.*

44

As stated above, Szanyi made the initial call to the Santa Fe Police Department concerning appellant's driving. Aside from a conclusory statement in his request for a writ of attachment that Szanyi was a "material witness," the only statements defense counsel made concerning why Szanyi's testimony was material were statements that the defense needed Szanyi's presence at trial to test, via cross-examination, his credibility, the accuracy of his observations, and his biases and prejudices. Defense counsel did not present any argument that Szanyi's testimony would have been any different from the contents of his call to the Santa Fe Police Department, which described appellant's erratic driving and was, as the State points out, not favorable to appellant. Defense counsel has never given any indication—either when counsel requested the writ of attachment or when counsel moved for a new trial, or on appeal—that Szanyi would have presented any testimony that was favorable to him. Both the state and federal constitutions guarantee a defendant's right to compulsory process for obtaining witnesses *in his favor* only, and the burden is on the defendant to establish that a witness's testimony would be both material and favorable to him. *See, e.g.*, *Coleman*, 966 S.W.2d at 527–28; *see also Sturgeon*, 106 S.W.3d at 88 (stating that, to preserve error when subpoenaed witness does not appear for trial, witness's testimony must be relevant and material and "[t]he exclusion or denial of irrelevant or cumulative testimony does not amount to reversible error").

We conclude that appellant has not established that Szanyi's testimony would have been either material or favorable to appellant, and, based on this record, in which there is no indication that Szanyi would have testified any differently from his call to the Santa Fe Police Department, we cannot conclude that refusing to issue a writ of attachment for Szanyi contributed to appellant's conviction or punishment.

## C.     *Motion for Continuance*

Appellant also contends that the trial court erred by denying his renewed motion for a continuance filed the morning testimony began.

Code of Criminal Procedure article 29.03 provides that "[a] criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." TEX. CODE CRIM. PROC. ANN. art. 29.03. Article 29.13 governs motions for continuance made after trial has started and provides that a continuance may be granted "when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." *Id.* art. 29.13. When a defendant's motion for continuance is based on an absent witness, the motion must show that (1) the defendant has exercised diligence to procure the witness's attendance, (2) the witness is not absent by the procurement or consent of the defense, and (3) the motion is not made for delay; and (4) the facts expected to be

46

proved by the witness. *Harrison v. State*, 187 S.W.3d 429, 434 (Tex. Crim. App. 2005); TEX. CODE CRIM. PROC. ANN. art. 29.06.

We review a trial court's ruling on a motion for continuance during trial for an abuse of discretion. *Guerrero v. State*, 528 S.W.3d 796, 799 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). To establish an abuse of discretion, the appellant must show that the trial court erred in denying the motion for continuance and that the denial "actually and specifically prejudiced appellant's defense." *Id.* at 800; *De Vaughn v. State*, 239 S.W.3d 351, 355 (Tex. App.—San Antonio 2007, pet. ref'd) ("In order to establish an abuse of the trial court's discretion, an appellant must show that the denial of his motion for continuance resulted in actual prejudice."). "Speculation will not suffice to obtain reversal for a trial court's failure to grant a continuance." *Nwosoucha v. State*, 325 S.W.3d 816, 825 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). When a motion for continuance is premised on the absence of a witness, the motion "must show on its face the materiality of the absent testimony." *Cisneros v. State*, 290 S.W.3d 457, 469 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd); *see* TEX. CODE CRIM. PROC. ANN. art. 29.06(3) (providing that when motion for continuance is based on absence of witness, motion shall state "[t]he facts which are expected to be proved by the witness, and it must appear to the court that they are material"); *Harrison*, 187 S.W.3d at 434 (stating that "[m]ere

conclusions and general averments are not sufficient for the court to determine their materiality").

Here, in his renewed motion for continuance, appellant stated only that Szanyi was "a material adverse witness subject to confrontation and cross-examination in this case" and that Szanyi "was necessary for Defendant's defense." This motion did not state the facts expected to be proved by Szanyi and did not, beyond the conclusory statement that Szanyi was a "material adverse witness," demonstrate how Szanyi's testimony was material to the defense. We conclude that because appellant's renewed motion for continuance did not, on its face, show the materiality of Szanyi's testimony but instead only generally and speculatively stated that Szanyi was a material witness, the trial court did not err by denying the renewed motion for continuance. *See Harrison*, 187 S.W.3d at 434; *Nwosoucha*, 325 S.W.3d at 825; *Cisneros*, 290 S.W.3d at 469.

**D.** *Whether Texas Constitution Provides Greater Protection for Compulsory Process than Sixth Amendment*

In his second issue, appellant argues that, in Texas, trial courts possess the "inherent power" to issue compulsory process and that a "greater right" to compulsory process exists under Texas law than under the Sixth Amendment.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. Similarly, Article I, Section 10 of the Texas

48

Constitution provides that "[i]n all criminal prosecutions the accused . . . shall have compulsory process for obtaining witnesses in his favor." TEX. CONST. art. I, § 10. Both the United States and Texas Constitutions thus protect the defendant's right to have compulsory process for *favorable* witnesses.

Appellant cites the Court of Criminal Appeals' decision in *Erwin* for the proposition that trial courts have the inherent power to issue compulsory process even in the absence of statutory authority or in the face of statutory prohibition. In *Erwin*, the Court of Criminal Appeals stated:

> So deep rooted is the right of compulsory process that this Court has observed that judges have the *inherent* power to issue compulsory process, notwithstanding either the absence of statutory authority or the presence of statutory prohibition, when necessary to protect the rights guaranteed under [Texas Constitution Article I, Section 10].

*See* 729 S.W.2d at 713. The court in *Erwin* then stated that, to preserve error when a subpoenaed witness does not appear for trial, the party must follow three steps, including showing what the witness would have testified to and that the testimony the witness would have given was relevant and material. *Id.* at 714; *see Sturgeon*, 106 S.W.3d at 85 (referring to test created in *Erwin*). Thus, even as a matter of state law, a defendant seeking attachment for an absent witness must demonstrate both what the witness would have testified to and that the testimony was material to the defense. Appellant has not made these showings in this case.

We therefore conclude that, even assuming the Texas Constitution grants greater rights to compulsory process than the Sixth Amendment does, appellant has not demonstrated that he is entitled to relief under Texas law.

We overrule appellant's first and second issues.

**Confrontation Clause**

In his third issue, appellant contends that the trial court violated his confrontation rights under the Sixth Amendment and Article I, section 10 of the Texas Constitution when it admitted Szanyi's call to the non-emergency line of the Santa Fe Police Department into evidence. In his fourth issue, he contends that the deprivation of his compulsory process and confrontation rights violated his right to a fair trial under the Fifth and Fourteenth Amendments.

*A.*     *Standard of Review and Governing Law*

Both the United States and the Texas Constitution provide that, in all criminal prosecutions, the accused shall have the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The purpose of the Confrontation Clause is

> to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

50

*Woodall v. State*, 336 S.W.3d 634, 641–42 (Tex. Crim. App. 2011) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43 (1895)); *Johnson v. State*, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016) (stating that main purpose of Confrontation Clause is "to secure for the opposing party the opportunity of cross-examination because that is 'the principal means by which the believability of a witness and the truth of his testimony are tested'") (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

The Confrontation Clause prohibits admission of out-of-court statements that are testimonial in nature unless the prosecution can demonstrate that the out-of-court declarant is presently unavailable to testify, and the defendant has had a prior opportunity to cross-examine the declarant. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004). Whether a statement is testimonial or non-testimonial is a question of law that we review de novo. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008); *Cook v. State*, 199 S.W.3d 495, 497 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that we review de novo trial court's ruling that admission of statement did not violate rights under Confrontation Clause). "Testimonial" statements include, among other things, ex parte in-court testimony or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the accused was not able to cross-examine, and similar pretrial statements the declarant would "reasonably expect to be used prosecutorially." *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010) (citing *Wall v. State*, 184 S.W.3d 730, 735 (Tex.

51

Crim. App. 2006)); *De La Paz*, 273 S.W.3d at 680 ("Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution.").

The primary focus in determining whether a particular hearsay statement is testimonial "is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations." *De La Paz*, 273 S.W.3d at 680; *see Coronado v. State*, 351 S.W.3d 315, 324 (Tex. Crim. App. 2011) ("If the objective purpose of the interview is to question a person about past events and that person's statements about those past events would likely be relevant to a future criminal proceeding, then they are testimonial."). Once a defendant objects to admission of a statement as a violation of the Confrontation Clause, the burden shifts to the State, as the proponent of the evidence, to establish that the statement (1) did not contain testimonial hearsay, or (2) did contain testimonial hearsay but was nevertheless admissible under *Crawford*. *De La Paz*, 273 S.W.3d at 680–81.

Courts, including the United States Supreme Court and this Court, have addressed whether calls to 911 constitute testimonial hearsay and thus whether the statements made in such calls violate the Confrontation Clause. In *Davis v. Washington*, the Supreme Court held that a domestic violence victim's 911 call

reporting the defendant's assault of her was not testimonial and admission of the call did not violate the Confrontation Clause. 547 U.S. 813, 829 (2006). The Court stated:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. The Court noted that, unlike a custodial interrogation, a 911 call, "and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827 (quoting *Crawford*, 541 U.S. at 51). In *Davis*, the declarant "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events,'" the declarant "was facing an ongoing emergency," the declarant's statements "were necessary to be able to *resolve* the present emergency" rather than to simply learn what had happened in the past, and the declarant was not speaking during a formal interview but was providing "frantic answers" over the phone in an unsafe environment. *Id.* (quoting *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality op.)).

The Court in *Davis* articulated a non-exhaustive list of factors to consider when determining whether statements were made during an ongoing emergency, including: (1) whether the situation was still in progress; (2) whether the questions sought to determine what is presently happening as opposed to what has happened in the past; (3) whether the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime; and (4) whether the events were deliberately recounted in a step-by-step fashion. *See id.* at 830–32; *Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008). This Court has noted that, in determining whether statements are testimonial, courts generally look to the degree of formality of the declarant's interaction with police, the purpose and structure of police questioning, and the likelihood that the declarant expects that the statements could be used in a criminal prosecution. *Cook*, 199 S.W.3d at 497–98. "Statements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Id.* at 498. Statements made during 911 calls are typically considered nontestimonial because they are "a cry for help" or "the provision of information enabling officers immediately to end a threatening situation." *See Davis*, 547 U.S. at 832; *Cook*, 199 S.W.3d at 498; *see also Ramjattansingh v. State*, 587 S.W.3d 141, 159 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Statements made during a 911 call under circumstances objectively

54

showing that the primary purpose of the call was to enable police assistance for an ongoing emergency, however, are not testimonial.").

## B.      *Whether Szanyi's Call Was Testimonial*

Here, Szanyi called the administrative line of the Santa Fe Police Department—not 911—to report a possible instance of drinking and driving. Szanyi stated that he had been directly behind a white Envoy or Trailblazer with paper license plates and the driver had been driving recklessly: driving down the center lane of the highway and weaving in and out of traffic, and had nearly been involved in a head-on collision. Szanyi saw the driver throw what appeared to be a green beer bottle from the car window before making a U-Turn and pulling into the parking lot of a local bar. Szanyi told the dispatcher that, from what he could see, the driver had not gone inside the bar but was still sitting in his vehicle.

At the time Szanyi made his call, appellant was no longer driving on the highway but had parked his vehicle in the parking lot of a local bar. Appellant was still sitting inside his vehicle as Szanyi was on the phone. Thus, although appellant was no longer driving at the time of the call, he was still out in public and in his vehicle. Szanyi's call—which related appellant's driving behavior, including a near head-on collision—was therefore made "mainly to enable a police response to an ongoing emergency." *See Ramjattansingh*, 587 S.W.3d at 160; *Cook*, 199 S.W.3d at 496, 498 (concluding that 911 call made immediately after caller witnessed

defendant "gesture obscenely and throw a beer bottle at [the caller's] truck" was made "to inform police of a potential crime in progress"); *see also Santacruz v. State*, 237 S.W.3d 822, 828–29 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (concluding that 911 call was nontestimonial even though complainant described events that had occurred ten to fifteen minutes earlier and noting that *Davis* does not require declarant to be describing offense "as it is happening").

Szanyi was the one who initiated the contact with the dispatcher when he called the police department's administrative line. *See Cook*, 199 S.W.3d at 498 ("Statements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial."). His call was informal, and most of his statements were made spontaneously, with little prompting or questioning from the dispatcher. *See id.* at 497–98 (considering degree of formality of declarant's interaction with police, purpose and structure of police questioning, and likelihood that declarant expects that statements could be used in criminal prosecution). Although Szanyi sounded calm and composed, and not frantic, during his call, the primary purpose of his call was to alert police to the presence of a potentially intoxicated and dangerous driver; a driver who, although parked in a parking lot at the time of the call, was still in his vehicle and was still in public. *See Ramjattansingh*, 587 S.W.3d at 161 ("In sum, [the caller] related events as they happened, reporting a drunk driver who was still on the road and posed an ongoing

56

danger, his statements were for immediate police assistance, were frequently made without prompting or in response to questioning, and were spontaneous and concerned public safety."); *Cook*, 199 S.W.3d at 498 (noting that 911 caller informed police "of a potential crime in progress," police contact was initiated by witness, contact was informal, and contact occurred at beginning of investigation); *see also Langham*, 305 S.W.3d at 579 ("But for as long as the emergency situation is still ongoing, the 'primary purpose' of the communication is not to develop a factual predicate for later litigation; rather, it is to decide how to respond appropriately to the situation.").

We conclude that Szanyi's call to the Santa Fe Police Department was analogous to the calls made in *Ramjattansingh* and *Cook*, which this Court held were non-testimonial. As in those cases, we conclude that this call was non-testimonial, and, therefore, the trial court's admission of this call did not violate appellant's rights under the Confrontation Clause. *See Ramjattansingh*, 587 S.W.3d at 161; *Cook*, 199 S.W.3d at 498.

We overrule appellant's third issue.[11]

---

[11]  In his fourth issue, appellant argues that his due process right to a fair trial was violated when he was denied his rights of confrontation and compulsory process under both the United States and Texas Constitutions. We have held, however, that the trial court did not violate appellant's rights of confrontation or of compulsory process. We therefore overrule appellant's fourth issue.

57

## C.      *Whether Szanyi's Call Was a Business Record*

In a portion of his seventh issue, appellant argues that the State offered Exhibit 11—Szanyi's call—with a business records affidavit, but this affidavit does not appear in the appellate record, and the State failed to establish that the call was a business record.

To the extent appellant argues that the trial court should have excluded Szanyi's call on the basis of hearsay for this reason, we agree with the State that the call does not constitute inadmissible hearsay because it falls under another exception to the hearsay rule—that of a present sense impression. Hearsay is a statement other than one made while the declarant is testifying at trial that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d). One exception to the hearsay rule is if the statement is a present sense impression: "A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." TEX. R. EVID. 803(1).

As we have already discussed with respect to appellant's third issue, Szanyi's call to the Santa Fe Police Department discussed what he had witnessed in the immediate past (appellant's driving on Highway 646) and what was currently happening (appellant's remaining in his vehicle while parked at Gator Jack's). Szanyi's statement to the dispatcher described an event "while or immediately after" Szanyi perceived that event. *See id.* We therefore agree with the State that Szanyi's

58

call was admissible under the present sense impression exception to the hearsay rule, and the trial court did not err by admitting this call. *See Castillo v. State*, 517 S.W.3d 363, 378 (Tex. App.—Eastland 2017, pet. ref'd) (noting that rationale for this exception to hearsay rule "stems from the statement's contemporaneity, not its spontaneity" and that five-minute lapse of time between event and statement "does not destroy the contemporaneity" of statement); *Reyes v. State*, 314 S.W.3d 74, 78 (Tex. App.—San Antonio 2010, no pet.) (holding that recording of 911 call fell within present sense impression exception because statements indicated caller was describing events as they were happening); *see also Fischer v. State*, 252 S.W.3d 375, 381 (Tex. Crim. App. 2008) ("If the declarant has had time to reflect upon the event and the conditions he observed, this lack of contemporaneity diminishes the reliability of the statements and renders them inadmissible under the [hearsay] rule.").

We overrule this portion of appellant's seventh issue.

**Fourth Amendment Violations**

In his fifth issue, appellant contends that the *Terry* stop and his detention violated the Fourth Amendment and that the trial court should have suppressed all resulting evidence. Specifically, appellant contends that, in determining reasonable suspicion, a call to a non-emergency line is not entitled to the same indicia of reliability as a 911 call and Szanyi's call to the Santa Fe Police Department lacked

sufficient details required to satisfy reasonable suspicion. He contends that the initial approach to his vehicle was a detention and that the detention of his vehicle was not supported by reasonable suspicion. He argues that the officers violated the limited scope of a *Terry* stop and had insufficient facts to give rise to an individualized suspicion of illegal activity. He further contends that the community caretaking and welfare check exceptions to the warrant requirement were not applicable.

## A.    *Standard of Review*

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). We view the evidence in the light most favorable to the trial court's determination, and we will reverse only if the ruling is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). Because the trial court is the sole trier of fact at a suppression hearing, we give almost total deference to the court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35 (Tex. Crim. App. 2017); *Story*, 445 S.W.3d at 732; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) ("The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony."). The trial court is entitled to believe or

60

disbelieve all or any part of a witness's testimony, even if that testimony is uncontroverted, because the court has the opportunity to observe the witness's demeanor and appearance. *Valtierra*, 310 S.W.3d at 447. This deferential standard of review also applies to a trial court's determination of historical facts based on a videotape recording admitted into evidence at a suppression hearing, although we may review de novo "'indisputable visual evidence' contained in a videotape." *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000)); *State v. Fikes*, 585 S.W.3d 636, 641 (Tex. App.—Austin 2019, no pet.).

If the trial court makes express findings of fact, we view the evidence in the light most favorable to its ruling and determine whether evidence supports the fact findings. *Valtierra*, 310 S.W.3d at 447. If the trial court does not make express factual findings, we still view the evidence in the light most favorable to the ruling, and we assume that the trial court made implied findings of fact that support its ruling as long as those findings are supported by the record. *Ramirez-Tamayo*, 537 S.W.3d at 35–36 (quoting *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006)).

We review de novo the trial court's application of the law to facts that do not turn on credibility and demeanor. *Story*, 445 S.W.3d at 732; *see Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013) ("[A] question 'turns' on an evaluation of

61

credibility and demeanor 'when the testimony of one or more witnesses, if believed, is *always* enough to add up to what is needed to decide the substantive issue.'") (quoting *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998)). We will uphold the trial court's ruling if the decision is correct under any theory of applicable law. *Cortez*, 543 S.W.3d at 203.

## B.    *Governing Law*

A warrantless detention of a person must be justified by reasonable suspicion. *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015); *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). "A law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014) (quoting *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013)). An officer has reasonable suspicion to detain a person if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person is, has been, or soon will be engaging in criminal activity. *Jaganathan*, 479 S.W.3d at 247; *Derichsweiler*, 348 S.W.3d at 914; *Carmouche*, 10 S.W.3d at 328 (stating that officer is generally justified in briefly detaining individual on less than probable cause for purpose of investigating possible criminal behavior if officer has reasonable suspicion). This is an objective inquiry that

disregards the subjective intent of the officer and looks, instead, to whether an objectively justifiable basis for the detention existed. *Derichsweiler*, 348 S.W.3d at 914.

When determining whether an officer had reasonable suspicion, we consider the totality of the circumstances. *Id.*; *Navarette v. California*, 572 U.S. 393, 397 (2014) ("The standard takes into account 'the totality of the circumstances—the whole picture.'") (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "[C]ircumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Derichsweiler*, 348 S.W.3d at 914; *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997) ("[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular types of noncriminal acts.").

The reasonable suspicion determination is dependent upon "both the content of the information known to the officer and its degree of reliability." *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011). The detaining officer "need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.'" *Derichsweiler*, 348 S.W.3d at 914 (citing *Adams v. Williams*, 407 U.S. 143,

63

147 (1972), and quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)). Ordinarily, a 911 dispatcher is regarded as a "cooperating officer" for the purposes of making this determination. *Id.* Information provided to police from a citizen-informant who identifies himself "and may be held to account for the accuracy and veracity of his report may be regarded as reliable." *Id.* at 914–15. "In such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot." *Id.* at 915.

## C.     *Whether Klonaris Had Reasonable Suspicion to Detain Appellant*

Appellant argues that Officer Klonaris did not have reasonable suspicion to detain him for a DWI investigation, contending that Szanyi's call to the Santa Fe Police Department lacked sufficient indicia of reliability to provide reasonable suspicion. Appellant argues that Szanyi was not a "known informant," whose reputation and credibility could be assessed; Szanyi did not call 911, which allows for calls to be recorded and traced; no ongoing emergency was occurring at the time of the call; Szanyi's call lacked sufficient detail; and, aside from the fact that Klonaris discovered a white Envoy in the Gator Jack's parking lot, no information contained in the call was corroborated before Klonaris began his investigation.

A traffic stop may be justified if the facts underlying the stop are observed by a civilian informant. *Pate v. State*, 518 S.W.3d 911, 914 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *see Navarette*, 572 U.S. at 397 (stating that Supreme Court has rejected argument that reasonable suspicion for investigative stop can only be based on officer's personal observations, rather than on information supplied by another person). "Courts have identified several indicia of reliability with respect to tips from a citizen informant." *Pate*, 518 S.W.3d at 914.

An informant may be considered more reliable if he provides a firsthand account of events and a detailed description of wrongdoing. *Id.*; *see Navarette*, 572 U.S. at 399 (stating that when 911 caller identified color, make, model, and license plate of vehicle that had run her off road, she "necessarily claimed eyewitness knowledge of the alleged dangerous driving" and "[t]hat basis of knowledge lends significant support to the tip's reliability"). A caller's report of an incident soon after it occurred also lends reliability. *Navarette*, 572 U.S. at 399 ("That sort of contemporaneous report has long been treated as especially reliable."). "Courts also consider an informant who is not connected with the police inherently trustworthy when advising the police of suspected criminal activity." *Pate*, 518 S.W.3d at 914; *Taflinger v. State*, 414 S.W.3d 881, 885 (Tex. App.—Houston [1st Dist.] 2013, no pet.). An anonymous tip alone is rarely sufficient to justify a traffic stop, but an anonymous tip supported by other "sufficient indicia of reliability" may be enough

65

to justify a stop. *Pate*, 518 S.W.3d at 915; *see Navarette*, 572 U.S. at 397. However, "when the informant provides self-identifying information that makes himself accountable for the intervention, the degree of reliability significantly improves." *Martinez*, 348 S.W.3d at 923; *Taflinger*, 414 S.W.3d at 885.

Here, Szanyi called the administrative line of the Santa Fe Police Department to report a possible DWI. He did not call 911,[12] but he called the police department, his call was recorded, and he provided his name, which "significantly improves" the reliability of the tip that he provided. *See Martinez*, 348 S.W.3d at 923; *Taflinger*, 414 S.W.3d at 885. Szanyi reported that he had been driving southbound on Highway 646 behind a white Envoy or Trailblazer with paper license plates and the driver had been driving erratically. He stated that the driver had crossed over the center lane of the highway, had weaved in and out of traffic, and had nearly been involved in a head-on collision. He also stated that he saw the driver throw a green beer bottle out of the window. Szanyi reported that the driver of the vehicle made a U-Turn and pulled into the parking lot of Gator Jack's. When asked if the driver had

---

[12] To the extent appellant argues that Szanyi's tip was not reliable because he called the administrative line of the Santa Fe Police Department and not 911, whether the caller uses the 911 system is "only one of the indicia of reliability" of a tip, and it is not dispositive. *See Pate v. State*, 518 S.W.3d 911, 915–16 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (rejecting defendant's attempt to distinguish *Navarette*, which involved 911 call, on basis that no evidence in record indicated that caller called 911, as opposed to another line operated by police department); *see also Taflinger v. State*, 414 S.W.3d 881, 886–87 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (holding that tip was reliable and sufficiently corroborated even though caller called police officer's personal cell phone to report possible DWI).

gone inside, Szanyi stated, "No, he hasn't got out yet. He's still sitting in his vehicle." Klonaris arrived at Gator Jack's, located on Highway 646, thirteen minutes after Szanyi's call and observed one white Envoy with paper license plates parked in the parking lot. When Klonaris approached the vehicle, which was still running, he observed appellant asleep in the driver's seat.

Although appellant was no longer driving at the time of the call, Szanyi reported that he could see that appellant was still inside his vehicle; thus, Szanyi made a contemporaneous report to the police department. *See Navarette*, 572 U.S. at 399 (stating that reports of events made contemporaneously or soon thereafter have "long been treated as especially reliable"); *State v. Stolte*, 991 S.W.2d 336, 342 (Tex. App.—Fort Worth 1999, no pet.) ("In addition, [the caller] told the dispatcher that he was personally watching [the defendant], which entitled the police to give greater weight to the tip."). Szanyi described appellant's driving in detail, indicating that he had "firsthand knowledge of appellant's impaired and dangerous driving," which "lends significant support to the tip's reliability." *See Pate*, 518 S.W.3d at 915 (quoting *Navarette*, 572 U.S. at 399). Szanyi further provided specific information about the color and model of the vehicle, the fact that the vehicle had paper license plates, and the location of the vehicle in the Gator Jack's parking lot. Klonaris discovered a vehicle matching Szanyi's description at the location Szanyi reported and discovered appellant still inside the vehicle. *See id.* ("The fact that the officer

was able to locate a moving vehicle at the location provided by the caller is additional evidence available to the officer that the caller reported the incident soon after the near collision."). All of these factors increased the reliability of the information that Szanyi provided to the dispatcher, who then provided that information to Klonaris.

Furthermore, in addition to Szanyi's call to the police department, when Klonaris approached the parked vehicle, and before he spoke with appellant, he testified that the vehicle was running, that appellant was asleep in the driver's seat, and that he saw a six-pack of green beer bottles in the front passenger seat, one of which was missing, and four of which were empty. Considering the totality of the circumstances, we conclude that Szanyi's call—which was supported by sufficient indicia of reliability—and Klonaris's observations prior to initiating conversation with appellant provided Klonaris with reasonable suspicion that appellant had been driving while intoxicated.[13] *See Jaganathan*, 479 S.W.3d at 247 ("Reasonable suspicion exists if the officer has 'specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity'") (quoting *Abney*, 394 S.W.3d at 548); *Carmouche*, 10 S.W.3d at 328 (stating that

---

[13] Because we conclude that Szanyi's call to the police department and Klonaris's observations before initiating conversation with appellant provided Klonaris with reasonable suspicion, we do not address appellant's arguments in his fifth issue concerning the "community caretaking" exception to the warrant requirement.

officer is generally justified in briefly detaining individual on less than probable cause for purpose of investigating possible criminal behavior if officer has reasonable suspicion). It was therefore reasonable under the circumstances for Klonaris to detain appellant to further investigate the potential DWI. *See Pate*, 518 S.W.3d at 916; *see also Stolte*, 991 S.W.2d at 343 (considering, in case in which caller reported defendant's erratic driving behavior, fact that "suspected offense involved an immediate threat to the public safety" and concluding that, based on information received concerning defendant's driving, it was reasonable for officer to suspect defendant "might be driving while intoxicated and to conclude that a brief detention was warranted to further investigate").

During the investigatory detention, appellant admitted driving his vehicle to Gator Jack's and admitted that he had been drinking. Klonaris testified that he could smell alcohol on appellant's person, appellant was slurring his words, and appellant's clothing was disorderly. Appellant demonstrated multiple clues of intoxication on each of the field sobriety tests. Thus, by the time Klonaris decided to arrest appellant, Klonaris had developed probable cause that appellant had been driving while intoxicated. *See, e.g.*, *LeCourias v. State*, 341 S.W.3d 483, 488–89 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding that officer had probable cause to arrest defendant for DWI based on information witness provided to 911 dispatcher concerning defendant's erratic driving, defendant's "dismal"

performance on field sobriety tests during which he "exhibited signs of intoxication," and odor of alcohol on defendant's person and breath); *Banda v. State*, 317 S.W.3d 903, 911 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (holding that officer had probable cause to arrest defendant for DWI based on information witness provided concerning defendant's erratic driving and defendant's performance on field sobriety tests). Klonaris then obtained a warrant for a blood draw. We hold that the trial court did not err by denying appellant's motion to suppress.

We overrule appellant's fifth issue.

### Jury Instructions

Finally, in his sixth issue, appellant contends that the trial court erred by refusing to submit a jury charge pursuant to Code of Criminal Procedure article 38.23 concerning illegally obtained evidence.

### A. *Standard of Review and Governing Law*

We review jury charge error in a two-step process. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). The first step is to determine whether there is error in the charge. *Id.*; *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If there is error and the defendant objected to the error at trial, we must reverse "if the error 'is calculated to injure the rights of the defendant,' which we have defined to mean that there is 'some harm.'" *Barrios*, 283 S.W.3d at 350 (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). We must determine whether

70

the defendant suffered actual harm, rather than merely theoretical harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In determining harm, we consider the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, the argument of counsel, "and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011).

> Code of Criminal Procedure article 38.23(a) provides:
>
> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a). To be entitled to a jury instruction under article 38.23(a), the defendant must show that (1) an issue of historical fact was raised in front of the jury; (2) the fact was contested by affirmative evidence at trial; and (3) the contested fact is material to the constitutional or statutory violation that the defendant has identified as rendering the particular evidence inadmissible. *Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012) (citing *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007)); *Oursbourn v. State*, 259 S.W.3d 159, 177 (Tex. Crim. App. 2008) (stating that factual dispute can only be

71

raised by affirmative evidence, "not by mere cross-examination questions or argument").

"When a disputed, material issue of fact is successfully raised, the terms of the statute are mandatory, and the jury must be instructed accordingly." *Robinson*, 377 S.W.3d at 719; *Ramjattansingh*, 587 S.W.3d at 151 (stating that article 38.23 instruction "must address the parties' disagreement about a 'specific historical fact that is material to the legality of obtaining the evidence'") (quoting *Holmes v. State*, 248 S.W.3d 194, 200 (Tex. Crim. App. 2008)). The disputed fact must be "an essential one in deciding the lawfulness of the challenged conduct." *Madden*, 242 S.W.3d at 511. If other facts that are not in dispute are sufficient to support the lawfulness of the challenged conduct, the trial court will not submit the disputed fact issue to the jury "because it is not material to the ultimate admissibility of the evidence." *Id.* at 510; *Ramjattansingh*, 587 S.W.3d at 151.

The evidence to justify an instruction under article 38.23 may be derived from any source, no matter whether the evidence is strong, weak, contradicted, unimpeached, or unbelievable, but it must raise a factual dispute concerning how the evidence was obtained. *Robinson*, 377 S.W.3d at 719. "Where the issue raised by the evidence at trial does *not* involve controverted historical facts, but only the proper application of the law to undisputed facts, that issue is properly left to the determination of the trial court." *Id.*

**B.** ***Entitlement to Article 38.23 Instruction***

Appellant argues that he was entitled to an instruction under article 38.23 because there was a disputed fact issue about whether the vehicle that he was found in was running or not running at the time of the traffic stop. Klonaris testified at trial that the vehicle was running when he approached it; appellant argued that this evidence was disputed by the video recording of Klonaris's dash camera and Klonaris's testimony at the suppression hearing, in which he did not testify that the vehicle was running. Appellant argues that this disputed fact is essential to the issue of whether he was operating his vehicle, as well as whether Klonaris had reasonable suspicion to detain him.

At trial, Klonaris testified that, when he approached appellant's vehicle, the vehicle was running. Klonaris agreed with defense counsel that he did not testify at the suppression hearing that appellant's vehicle was running, but he then agreed with the State that, at that hearing, no one asked him whether the vehicle was running. The trial court admitted the video recording from Klonaris's dash camera. Klonaris agreed with defense counsel that he did not make any statements on the video recording concerning whether the vehicle was running, and he did not recall asking appellant to turn off his vehicle.

We agree with the State that no affirmative evidence in the record creates a factual dispute concerning whether appellant's vehicle was running at the time

73

Klonaris approached it. The video recording from Klonaris's dash camera does not indicate one way or the other whether the vehicle was running. Additionally, Klonaris's testimony on cross-examination agreeing with defense counsel that he did not state on the video recording that the car was running is not affirmative evidence that the vehicle was not running. Similarly, Klonaris's failure to testify at the suppression hearing that the vehicle was running—when he was not asked by either party whether it was or not—is not affirmative evidence that the vehicle was not running. We conclude that the issue of whether appellant's vehicle was running at the time Klonaris approached it was not contested by affirmative evidence at trial. *See Robinson*, 377 S.W.3d at 719; *Oursbourn*, 259 S.W.3d at 177 (stating that factual dispute can only be raised by affirmative evidence, "not by mere cross-examination questions or argument"). We therefore hold that appellant was not entitled to a jury instruction under article 38.23, and the trial court did not err by not giving such an instruction.

We overrule appellant's sixth issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Lloyd, and Landau.

Publish. TEX. R. APP. P. 47.2(b).